FILED
United States Court of Appeals
Tenth Circuit

April 16, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RONALD RAY HORNER,

      Defendant - Appellant.

No. 18-1350
(D.C. No. 1: 17-CR-00077-PAB-1)
(Colo.)

**ORDER AND JUDGMENT**[*]

Before **BACHARACH**, **McKAY**, and **O'BRIEN**, Circuit Judges.

On May 4, 2016, Ronald Ray Horner was indicted in the District of Montana for

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

transporting child pornography.[1]  *See* 18 U.S.C. § 2252(a)(1) and (b).  He was released

pretrial and allowed to reside in the District of Colorado.  But his release was conditional.

Among other things, he promised to (1) surrender his passport to the probation officer no

later than June 9, 2016, (2) not obtain a new passport, and (3) submit to location

monitoring.  His promise was short-lived.

Horner surrendered his passport to the probation officer on June 7, 2016.  Then,

about two months later, on August 9, 2016, he applied for a new passport at the

Walsenburg, Colorado post office.  Although the application form required him to

truthfully answer the questions and warned him of the consequences for failing to do so

(fine and/or imprisonment under 18 U.S.C. §§ 1001 and 1542), he nevertheless falsely

claimed: "Passport was left in suitcase after vacation (January 2016).  Suitcase had torn

seam and was discarded [in a dumpster at the Minute Mart in Walsenburg, Colorado on

or about April 10, 2016].  I forgot the passport was in the suitcase."  (R. Vol. 5 at 221.)

After taking an oath swearing to the truth of its contents, he signed the form under

penalty of perjury and paid a fee to have the application expedited.

Shortly thereafter, he received a new passport in the mail.[2]  On September 2, 2016,

_____

[1] We grant the government's request to take judicial notice of the indictment, jury verdict, Presentence Report, Statement of Reasons, and judgment from the District of Montana case.  *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

[2] The government admitted the State Department was mistakenly never notified that Horner was prohibited from having a passport.

he cut off his electronic location monitoring bracelet and fled to Mexico and then South America using his new passport. After five months on the lam, his peripatetic ways abruptly ended. Immigration officials from Guyana notified the State Department of his whereabouts. He was sent back to the United States, where he was taken into custody.

For this conduct, he was indicted in the District of Colorado (the current case) with making a false statement in a passport application in violation of 18 U.S.C. § 1542. At his insistence, Horner represented himself, but was assisted by standby counsel. A jury convicted him after a one-day trial. By then he was also convicted of the child pornography charge in Montana and sentenced to 154 months imprisonment.

The presentence report (PSR) in the current case calculated a base offense level of 8. *See* USSG § 2L2.2(a). Four levels were added because Horner "fraudulently obtained or used . . . a United States passport." *Id*. § 2L2.2(b)(3). Because Horner committed the offense while on pretrial release in the District of Montana, the probation officer determined 18 U.S.C. § 3147 applied. As a result, another 3 levels were added, *see* USSG § 3C1.3, resulting in a total offense level of 15. Not only that, he was subject to an additional consecutive sentence not to exceed 10 years. *See* 18 U.S.C. § 3147 ("A person convicted of an offense committed while released [pretrial] . . . shall be sentenced, in addition to the sentence prescribed for the [underlying] offense to . . . a term of imprisonment of not more than ten years if the offense is a felony. . . . A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment."). With a Criminal History Category of II (resulting from his Montana

conviction), the advisory guideline range was 21 to 27 months imprisonment.  The judge

sentenced him to 27 months.  He divided the sentence into two consecutive terms—21

months imprisonment for the underlying false statement offense and a consecutive 6

months imprisonment under 18 U.S.C § 3147.  *See* USSG § 3C1.3, comment. (n.1) ("[I]n

order to comply with [18 U.S.C. § 3147], [sentencing courts] should divide the sentence .

. . between the sentence attributable to the underlying offense and the sentence

attributable to the enhancement.").  The sentence was to run consecutive to his Montana

sentence.

## Discussion

Horner, still proceeding pro se,[3] does not attack the factual basis for his

conviction, preferring instead to tilt at windmills.[4]  Our review is de novo.  *See United*

*States v. Pauler*, 857 F.3d 1073, 1075 (10th Cir. 2017) (reviewing de novo the denial of a

---

[3] We have liberally construed Horner's pro se materials, stopping short, however, of serving as his advocate.  *See United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009).

[4] In addition to the arguments we address below, Horner claims the Seventeenth Amendment, which calls for the election of Senators by the people of the State they are to represent, was not properly ratified because it was not approved by all of the States.  As a result, he tells us there has been no legitimate Senate, legislation, or judicial appointments since 1913.  Nonsense.  On May 31, 1913, Secretary of State William Jennings Bryan certified that the Seventeenth Amendment had been ratified by three-quarters of the States and therefore it "had become valid to all intents and purposes as a part of the Constitution of the United States."  https://www.archives.gov/legislative/features/17th-amendment/notification.html.  Such certification is "conclusive upon the courts."  *See Leser v. Garnett*, 258 U.S. 130, 137 (1922).  Moreover, Article V of the Constitution requires Amendments to be ratified by only "three fourths" of the States, not unanimously, as Horner contends.

motion to dismiss an indictment based on a question of law); *United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004) (reviewing de novo a claim that the exclusion of evidence violated a defendant's constitutional rights); *United States v. Saffo*, 227 F.3d 1260, 1267 (10th Cir. 2000) ("We review de novo questions regarding a statute's constitutionality.").

A. *Constitutionality of 18 U.S.C. § 3231*

The district court's jurisdiction over this case derived from 18 U.S.C. § 3231, which vests federal district courts with jurisdiction over "all offenses against the laws of the United States."[5] Prior to trial, Horner moved to dismiss the indictment for want of jurisdiction. As he would have it, § 3231 is unconstitutional because Congress failed to record the names of the persons voting for and against it in its journals as required by the Bicameralism and Presentment Clause, U.S. Const. art. I, § 7, cl. 2.[6] The judge denied

---

[5] In a related argument, he contends Congress impermissibly eliminated the United States' standing in enacting § 3231 because it used the phrase "all offenses against the laws of the United States" rather than the phrase "offenses against the United States," which is utilized in 28 U.S.C. § 547 (requiring the United States Attorney to "prosecute for all offenses against the United States") and in U.S. Const. art. II, § 2, cl. 1 (giving the President the "Power to grant Reprieves and Pardons for Offenses against the United States . . . ."). According to Horner, the latter phrase requires an injury-in-fact, which is necessary for standing, but the former phrase does not. This argument can be resolved in short-order. A violation of its laws injures the United States' sovereignty, which "suffices to support a criminal lawsuit by the Government." *Vt. Agency of Nat. Res. v. U.S. ex rel Stevens*, 529 U.S. 765, 771 (2000).

[6] On appeal, he also claims Congress failed to follow this Clause in enacting Titles 1, 4, 6, 9, and 17 of the United States Code. We decline to address this argument as it was not raised in the district court and Horner's failure to request plain error review on appeal, either in his opening or reply brief, "'surely marks the end of the road for an

the motion, relying on *United States v. Tony*, which rejected the argument that § 3231 was invalid because it failed to pass both Houses of Congress. 637 F.3d 1153, 1158 n.9 (10th Cir. 2011).

Horner claims *Tony* and the cases cited therein are inapposite because they concerned only whether a quorum was present when § 3231 was passed. He concedes a quorum was present but nevertheless contends § 3231 was not validly enacted because Congress failed to comply with the Bicameralism and Presentment Clause. But that Clause is not applicable here.

It provides:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

U.S. Const. art. I, § 7, cl. 2.

---

argument for reversal not first presented to the district court.'" *United States v. Lamirand*, 669 F.3d 1091, 1098 n.7 (10th Cir. 2012) (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011)); *cf. United States v. Courtney*, 816 F.3d 681, 684 (10th Cir. 2016) (reviewing argument for plain error in criminal appeal where appellant "argued plain error fully in his reply brief").

It plainly requires "Every Bill" to be passed by both Houses of Congress and to be presented to the President for his approval. *Id*. It also sets forth the process for overriding a President's veto: 2/3 of Congress must vote to override it and those votes are to be recorded in each House's journal. In other words, when Congress votes to override a President's veto, the votes must be recorded. *See* Ronald J. Krotoszynski, Jr., *Deconstructing Deem and Pass: A Constitutional Analysis of the Enactment of Bills by Implication*, 90 Wash. U. L. Rev. 1071, 1088-89 (2013). Because § 3231 was not vetoed by the President, a recording of the votes was not required. But Horner is not done, even though he mistakes persistence for persuasion.

According to him, the Bicameralism and Presentment Clause's recording of votes requirement is not limited to only those bills vetoed by the President. That is because its third sentence starts with "But in *all* such Cases" and is not otherwise linked to the second sentence by a comma or semi-colon. U.S. Const. art. I, § 7, cl. 2 (emphasis added). As a result, he tells us the third sentence refers to all bills, not just vetoed bills. To support his reading of the Clause, he points to other bills passed by Congress in which the votes were recorded but were not vetoed by the President. But doing more than is required in some cases does not raise the bar for all.

The relevant term is "in all *such* cases," not "all bills." U.S. Const. art. I, § 7, cl. 2 (emphasis added). "Such" means "of the character, quality, or extent previously indicated or implied." https://www.merriam-webster.com/dictionary/such. The logical reading of this clause is that "such cases" refers to the second sentence, i.e., those bills

vetoed by the President and sought to be overridden by 2/3 vote of each House.  In "such

cases," the votes must be recorded.  This conclusion is bolstered by the Journal Clause,

U.S. Const. art. I, § 5, cl. 3, which requires votes to be recorded in the Journals of each

House "only if at least one-fifth of the members present and voting request a recorded

vote on any question pending before the body."  *See* Ronald J. Krotoszynski, Jr.,

*Deconstructing Deem and Pass: A Constitutional Analysis of the Enactment of Bills by

Implication*, 90 Wash. U. Law Rev. at 1088.  To read the Bicameralism and Presentment

Clause as Horner advocates would improperly render the Journal Clause superfluous.

*See Wright v. United States*, 302 U.S. 583, 588 (1938) ("In expounding the Constitution

of the United States, . . . every word must have its due force, and appropriate meaning;

for it is evident from the whole instrument, that no word was unnecessarily used, or

needlessly added." (quotation marks omitted)).  The Journal Clause also explains why the

votes are recorded for some bills even when not vetoed by the President.[7]

---

[7] The government relies on the enrolled bill rule to preclude Horner's challenge to
the procedure by which § 3231 was enacted.  Under that rule:

> It is not competent for a party [challenging the validity of a statute] to show, from
> the journals of either house, from the reports of committees or from other
> documents printed by authority of Congress, that an enrolled bill differs from that
> actually passed by Congress. The only evidence upon which a court may act when
> the issue is made as to whether a bill asserted to have become a law, was or was
> not passed by Congress is an enrolled act attested to by declaration of the two
> houses, through their presiding officers.  An enrolled bill, thus attested, is
> conclusive evidence that it was passed by Congress. The enrollment itself is the
> record, which is conclusive as to what the statute is.

*Pub. Citizen v. U.S. Dist. Court for Dist. of Columbia*, 486 F.3d 1342, 1350 (D.C. Cir.

B. *Constitutionality of 18 U.S.C. § 1542*

Horner claims Congress had no authority to criminalize making a false statement on a passport application; as a result, he claims 18 U.S.C. § 1542 is unconstitutional.[8] According to him, the United States Constitution gives Congress authority only over four crimes: counterfeiting, piracies and felonies on the high seas, offenses against the law of nations, and treason. *See* U.S. Const., art. I, § 8, cl. 6, 10; U.S. Const. art. III, § 3, cl. 2. Making a false statement on a passport application is not one of them. Moreover, while Congress has the power to enact all laws "necessary and proper" to execute its enumerated powers, *see* U.S. Const. art. I, § 8, cl. 18, power over passports is not and has never been one of Congress's enumerated powers.

Yet he acknowledges that the Constitution gives Congress the power "[t]o regulate

---

2007) (citations and quotation marks omitted); *see also Marshall Field & Co. v. Clark*, 143 U.S. 649, 670, 672–73, 675, 680 (1892); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012) (unpublished). According to the government, because § 3231 was properly enrolled, it is immunized from judicial inquiry as to whether it was validly passed. For his part, Horner argues the enrolled bill rule, which Congress codified at 1 U.S. § 106, is unconstitutional.

We need not address the enrolled bill rule. We assume each House did not record the yea and nay votes of its members in its journals when § 3231 was passed but conclude such procedure did not violate the Bicameralism and Presentment Clause because it requires the recording of votes only when Congress seeks to override a President's veto, which did not occur with § 3231.

[8] Horner did not raise this argument in a timely manner in the district court. *See* Fed. R. Crim. P. 12(b)(3)(B)(v), (c)(3). As a result, the government claims he has waived the argument or it is subject to, at most, plain error review. Yet the government also suggests the argument may be jurisdictional; if so, our review is de novo. We need not split hairs. "Even applying the stricter de novo standard of review," the argument fails. *See Hjelle v. Mid-State Consultants, Inc.*, 394 F.3d 873, 879 (10th Cir. 2005).

Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3 (Foreign Commerce Clause (FCC)). This includes regulating (1) "the use of the channels of [foreign] commerce," (2) "the instrumentalities of [foreign] commerce," and (3) "those activities that substantially affect [foreign] commerce." *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (setting forth three broad categories of activity that Congress may regulate under its interstate commerce power); *United States v. Durham*, 902 F.3d 1180, 1206 ("The three *Lopez* categories provide a useful starting point in analyzing challenges under the FCC" but "[c]ongressional authority under the FCC is broader than [that] under the ICC."). Because a passport is required for a United States citizen to travel outside the United States, i.e., to use the channels and instrumentalities of foreign commerce, Congress had the authority under the FCC to regulate the obtaining of a passport, including criminalizing those who lie in seeking to obtain one.[9]

C. *Introduction of U.S. Constitution as Evidence*

Horner moved pretrial for permission to introduce the United States Constitution as evidence at trial. The judge did not then definitely decide the issue. However, he informed Horner he would be instructing the jury on the law needed to decide guilt, namely the elements of the charge, and "the Constitution is [not] really relevant to [the jury] figuring out how to determine whether you are guilty or not guilty." (R. Vol. 5 at

_____

[9] Congress had the authority to enact § 1542 under the FCC but there is another basis for its authority. Because a passport is required for a United States citizen to reenter the United States after traveling abroad, Congressional authority to enact § 1542 also arose under the Naturalization Clause. *See* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization . . . .").

336.)  Later, during his opening statement to the jury, Horner began to argue that § 1952 was unconstitutional.  The government objected to this legal argument and the judge sustained the objection, telling Horner to confine his opening statement to the facts.

Horner claims the judge's refusal to admit the Constitution as evidence or to otherwise allow him to rely on it interfered with his constitutional right to present a defense.  According to him, the jury has a duty to ensure he was not charged with violating an unconstitutional law, especially after the judge refused to so conclude.  He is mistaken.

A criminal defendant has a constitutional right to present a defense, including the right to present evidence.  *United States v. Pablo*, 696 F.3d 1280, 1295 (10th Cir. 2012). But that right is not absolute.  *Id*.  The evidence must be both relevant and material. *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005).  Relevant evidence is that which "has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence."  Fed. R. Evid. 401. "Evidence is material if its suppression might have affected the trial's outcome.  In other words, material evidence is that which is exculpatory—evidence that if admitted would create reasonable doubt that did not exist without the evidence."  *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) (citation omitted).

Horner did not seek to admit the Constitution to prove or disprove a fact or to create reasonable doubt as to his guilt.  He did so to support his <u>legal argument</u> that the statute of conviction was unconstitutional.  *See United States v. Evans*, 318 F.3d 1011,

- 11 -

1015 (10th Cir. 2003) ("[T]he constitutionality of a statute is a legal question."). But such arguments are to be decided by the judge, not the jury. *See Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("[I]t is axiomatic that the judge is the sole arbiter of the law and its applicability."). The judge decided the constitutionality of § 1542 contrary to Horner's arguments. Horner's remedy did not entitle him to seek a second opinion from the jury but rather to appeal to this Court, which he has done (albeit unsuccessfully).

Because the Constitution was neither relevant nor material evidence in this case, the judge properly excluded it.

D. *Application of 18 U.S.C § 3147*

Horner tells us the judge erred in applying 18 U.S.C. § 3147 to enhance his sentence because it was neither included in the indictment nor presented to the jury. But the judge correctly concluded the argument was foreclosed by our case law, which characterizes § 3147 as a mandatory sentencing enhancement, not a separate offense of conviction.

The Fifth Amendment generally prohibits a person from being "held to answer for a . . . *crime*, unless on presentment or indictment of a Grand Jury." (Emphasis added). But § 3147 is not a separate crime; it "is a self-executing sentence enhancement provision" for those defendants convicted of offenses while free on bond pending other judicial proceedings. *See United States v. Browning*, 61 F.3d 752, 756-57 (10th Cir. 1995) (collecting cases); *see also United States v. Patton*, 708 F. App'x 488, 490 (10th Cir. 2017) (unpublished); *United States v. Mowery*, 694 F. App'x 638, 641 (10th Cir.

- 12 -

2017) (unpublished).  As such, there was no need for it to be included in the indictment.

Of course, the Sixth Amendment (in conjunction with the Due Process Clause) requires any fact, other than a prior conviction, which increases the penalty for a crime beyond the prescribed statutory maximum or minimum to be submitted to a jury and proved beyond a reasonable doubt.  *Alleyne v. United States*, 570 U.S. 99, 102 (2013) (mandatory minimum); *Apprendi v. New Jersey* 530 U.S. 466, 490 (2000) (statutory maximum).  But the enhancements to Horner's sentence via § 3147 and USSG § 3C1.3 did not violate *Alleyne* or *Apprendi* because they did not affect the mandatory minimum sentence or increase Horner's sentence beyond the statutory maximum applicable to his underlying offense—making a false statement in a passport application in violation of § 1542.  *See* 18 U.S.C. § 1542 (calling for a 10-year maximum term of imprisonment); *United States v. Zar,* 790 F.3d 1036, 1054–55 (10th Cir. 2015) ("The defendants' reliance on *Apprendi* and *Alleyne* is misplaced as none of the defendants were subject to mandatory minimum sentences or sentenced beyond the statutory maximums for their convictions."); *United States v. Fredette*, 315 F.3d 1235, 1245 (10th Cir. 2003) ("*Apprendi* does not apply to sentencing factors that increase a defendant's guideline range but do not increase the statutory maximum"; because defendant's sentence does not exceed the total statutory maximum, he is not entitled to relief under *Apprendi*).  In fact, the commentary to § 3C1.3 "ensure[s] that the 'total punishment' (i.e., the sentence for the offense committed while on release plus the statutory sentencing enhancement under § 3147)" falls within the "guideline range for the offense committed while on release."

USSG §3C1.3, comment. (n.1); *United States v. Randall*, 287 F.3d 27, 30–31 (1st Cir. 2002) ("The Sentencing Commission's assimilation of § 3147 in [§3C1.3] effectively moots any *Apprendi* challenge to the application of § 3147. The Application Notes encourage sentencing judges to sentence within the guideline range for the base offense of conviction by using a § 3147 enhancement only for purposes of calibrating where, within the underlying conviction count guideline range, *a sentence below the applicable conviction count maximum* may be imposed." (emphasis added)).

Moreover, whether Horner was previously convicted of a felony offense committed while released pretrial falls within *Apprendi*'s prior conviction exception. *Randall*, 287 F.3d at 30 (fact-finding for purposes of applying § 3147 "may fairly be characterized as literally within the express exception recognized in *Apprendi* for the fact of a prior conviction" (quotation marks omitted)); *cf. United States v. Michel*, 446 F.3d 1122, 1132-33 (10th Cir. 2006) ("[W]hether prior convictions happened on different occasions from one another [for purposes of applying the Armed Career Criminal Act (ACCA)] is not a fact required to be determined by a jury but is instead a matter for the sentencing court.").

E. *Double Jeopardy*

Horner moved to dismiss the indictment claiming he had already been punished for the same conduct in the Montana case and therefore any additional punishment in this case would violate the Fifth Amendment's Double Jeopardy Clause. The judge denied the motion because the punishment meted out in Montana was for conduct different from

that charged here.

The Double Jeopardy Clause protects against, *inter alia*, "multiple punishments for the *same offense*." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (emphasis added), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). Horner is not clear as to how he was punished in the District of Montana for his conduct in this case. He refers to a five-level enhancement he received but that enhancement was for the number of images of child pornography involved there. Although he received a two-level enhancement for obstruction of justice based on his cutting off his ankle monitor and fleeing the United States, that conduct is different than the offense conduct here—making a false statement on a passport application.[10]

**AFFIRMED**. We **DENY** Horner's Motion to Unseal the Record. The documents he challenges—the transcripts from the grand jury, the verdict form containing the jurors' signatures, and the Presentence Report and related materials—are properly filed under seal. *See* 10th Cir. R. 11.3(C), Fed. R. Crim. P. 6(e)(6).

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

[10] Even if his Montana sentence was enhanced because of his criminal conduct in this case, such does not violate double jeopardy. *See Witte v. United States*, 515 U.S. 389, 398 (1995) ("[D]ouble jeopardy principles [do not] bar a later prosecution or punishment for criminal activity where that activity has been considered at sentencing for a separate crime.").